UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AYFER KAYA et al., : | |
| Plaintiffs : | CIVIL ACTION NO. |
| v. : | 3:05-CV-1436 (JCH) |
| : | |
| CITY OF NEW LONDON : | AUGUST 21, 2006 |
| Defendant : | |

**RULING ON DEFENDANTS' PARTIAL MOTION TO DISMISS [Doc. No. 17]**

**I.    INTRODUCTION**

This case involves twenty claims brought by Ayfer Kaya ("Ms. Kaya"), individually and as the next friend of her minor children, Aykurt J. Kalican ("Aykurt"), Goktay Kalican ("Goktay"), and Sevda Kalican ("Sevda") and by Marta Paguada, individually and as administrix of the estate of David Romero, against the City of New London, its mayor, city manager, police chief, and seven other members of the New London Police Department.  The defendants move, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss only counts VII (negligent infliction of emotional distress upon Aykurt), XIII (Marta Paguada's loss of consortium claim); XIV (Ms. Kaya's loss of consortium claim), XV (Aykurt's loss of consortium claim); XVI (Goktay's loss of consortium claim), and XVII (Sevda's loss of consortium claim).

**II.   STANDARD OF REVIEW**

In deciding a motion to dismiss, the court takes the allegations of the Complaint as true, and construes them in a manner favorable to the pleader.  Hoover v. Ronwin, 466 U.S. 558, 587 (1984); see Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overrruled on other grounds

1

by Davis v. Scherer, 468 U.S. 183 (1984).  The court must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Yung v. Lee, 432 F.3d 132, 146 (2d Cir. 2005) (discussing Rule 12(b)(6) motion to dismiss); Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (internal citations omitted) (discussing Rule 12(b)(1) motion to dismiss).

A motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), tests only the adequacy of the complaint.  United States v. City of New York, 359 F.3d 83, 87 (2d Cir. 2004).  A Rule 12(b)(6) motion can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Id. (quotation omitted).  However, "bald assertions and conclusions of law will not suffice" to meet this pleading standard.  Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).

### III.    FACTS[1]

The facts alleged in this case are horrific.  In October 2002, Ms. Kaya called the New London Police Department 911 emergency number to seek the arrest of her then-husband, Kurtulus Kalican ("Mr. Kalican"), because he had threatened her and had used a sledgehammer to damage the floor of the family's residence on Blackhall Street

---

[1]The court takes the facts alleged by the Amended Complaint [Doc. No. 14] as true for purposes of this motion and draws all reasonable inferences in the plaintiffs' favor.

in New London.  Ms. Kaya and Mr. Kalican divorced in January 2003, and Ms. Kaya was awarded exclusive possession of the Blackhall Street residence.  In July and August 2003, Ms. Kaya called the New London Police Department 911 line on three separate occasions to report incidents involving her ex-husband.  In the first call, she reported that Mr. Kalican had come to the Blackhall Street residence and again threatened to kill her, and she reported that he intended to use a .357 magnum revolver that he had hidden in the basement of that house to do so.  About one month later, she called to report that the rear window of her car had been smashed while it was parked in front of the Blackhall Street residence.  The New London Police asked if she knew if Mr. Kalican had committed that vandalism, and she said that she suspected it but did not witness the vandalism.  The police did not question Mr. Kalican regarding this incident.  Several weeks later, Ms. Kaya again called 911 to report that Mr. Kalican had choked her.

The New London Police responded to the third call and arrested Kalican for Domestic Breach of the Peace in the Second Degree.  Ms. Kaya gave the police a sworn statement, in which she reported that Mr. Kalican owned a gun, which was registered to his former father-in-law, and that Mr. Kalican had threatened her in the past by saying that "if he catches my male friend in my house, he will kill him and me."  The New London Police Department provided a copy of the police report, which detailed Mr. Kalican's threats, to the Connecticut Superior Court.

The day after the choking, on August 22, 2003, the Connecticut Superior Court, Judicial District of New London, entered a family violence protective order against Mr. Kalican.  All of the individual defendants, as part of their official duties, are responsible

for executing or supervising the execution of family violence protective orders.  The protective order forbid Mr. Kalican from entering Ms. Kaya's dwelling, the Blackhall Street residence.  It also ordered him to surrender or transfer all firearms within five days of the date of the order.  However, he did not turn over his revolver, which was located in the basement of the Blackhall Street residence.  The defendants knew that this weapon was likely hidden in that basement, but the police did not question Mr. Kalican as to the whereabouts of that weapon or take any other steps to retrieve the weapon.  The defendants were also aware of Mr. Kalican's address in New Jersey, and had information regarding his history and propensity for violence, but they did not take steps to execute the protective order.

On or about 2:00 a.m. on September 22, 2003, Mr. Kalican made telephone calls to the Connecticut State Police and the New London Police Department.  He told New London Police Department dispatcher, defendant Michael Mariano, that there was a man in the Blackhall Street residence violating the protective order, and that he wanted the police to take action.  Mariano told Mr. Kalican that the protective order was "totally civil . . . we only do criminal, we don't do civil," and the police did not take any other action in response to his call.

Mr. Kalican then went to the Blackhall Street residence, where Ms. Kaya was sleeping beside her companion, David Romero ("Mr. Romero").  At approximately 4:15 a.m., Mr. Kalican entered the residence, in violation of the protective order.  He retrieved his revolver from the basement.  He then repeatedly shot both Mr. Romero and Ms. Kaya.  He murdered Mr. Romero and seriously wounded Ms. Kaya.

A minor son of Ms. Kaya and Mr. Kalican, Aykurt, witnessed Mr. Kalican fire the

revolver at, and kill, Mr. Romero and then run past Aykurt with the revolver still in his hand. Aykurt also witnessed his mother sitting on the bed, bleeding from her mouth. As a result of the events of September 22, the plaintiffs allege that Aykurt suffered and will continue to suffer sleeplessness, depression, great mental pain and anguish, and ongoing pervasive memories.

As a result of her injury, the plaintiffs allege that Ms. Kaya's minor children have and will be deprived of her financial support, services, care, affection, comfort, companionship, society, and consortium. Marta Paguada is Mr. Romero's sister. She received support, care, society, affection, companionship, and consortium from him prior to his death. Ms. Kaya, as Mr. Romero's companion, received financial support, services, care, society, affection, companionship, and consortium from Mr. Romero prior to his death.

## IV. DISCUSSION

### A. Aykurt Kalican's Emotional Distress Claim

The parties dispute whether Aykurt, by his mother, Ayfer Kaya, has alleged a claim for bystander emotional distress, see Clohessy v. Bachelor, 237 Conn. 31 (1996), or for negligent infliction of emotional distress, see Carrol v. Allstate Ins. Co., 262 Conn. 433 (2003). The tort of bystander emotional distress is based on a theory of negligence. See Clohessy, 237 Conn. at 45. However, the Connecticut Supreme Court has modified the pure "reasonable foreseeability rule" for the tort of bystander emotional distress by imposing specific limitations on this cause of action. Id. at 50-56. As a result, the pleading requirements for a claim of "bystander emotional distress"

differ from those for a "negligent infliction of emotional distress" claim.  At oral argument, plaintiffs' counsel stated that Aykurt and Ms. Kaya are not pursuing any claim for bystander emotional distress, but do press a claim for negligent infliction of emotional distress, based upon Aykurt's fear for his own life and safety.  Therefore, the court need consider only whether the Amended Complaint adequately alleges a negligent infliction of emotional distress claim, and need not consider whether it alleges a bystander emotional distress claim.

To state a claim for negligent infliction of emotional distress, a plaintiff must allege that:  "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."  Carrol, 262 Conn. at 444.  The plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm."  Id. at 446 (internal citation and quotation marks omitted).

The defendants argue that Aykurt and Ms. Kaya have pled that Aykurt's emotional injuries resulted from the apprehension of harm to another, rather than to himself, and that claims for negligent infliction of emotional distress require apprehension of harm to oneself.  Defs.' Reply Supp. Mot. Dismiss at 3-4 [Doc. No. 20-1] (quoting Shaham v. Wheeler, No. 321879, 1996 WL 409364, at * 2 (Conn.Super. Jun. 26, 1996)); see Doe v. Jacome, No. CV 980331360S, 1999 WL 329799, at *4 (Conn.Super. May 13, 1999) (quoting Shaham); see also Silber v. Walgreen Co., 2005

WL 1273969, at *1 (Conn.Super. 2005) (citing Clark v. New Britain General Hospital et al., 2002 WL 1150726 (Conn.Super. 2002); Barrett v. Danbury Hospital, 232 Conn. 242, 261 (1995)) (holding that "a cause of action for the negligent infliction of emotional distress requires that the plaintiff must be in danger or at risk"). Assuming without deciding that a negligent infliction of emotional distress claim does require apprehension of harm to oneself, the court finds that the Amended Complaint adequately alleges such apprehension. In addition to alleging that Aykurt saw his mother's facial gunshot wound shortly after she was shot, the Amended Complaint states, ". . . Aykurt J. Kalican, a minor, witnessed Kurtulus Kalican fire the said revolver at David Romero and then run past him with the said weapon in his hand." Am. Compl. at ¶ 20 [Doc. No. 14]. Although the Amended Complaint does not specify whether the word "him" refers to Mr. Romero or to Aykurt, a reader could reasonably infer that Mr. Kalican ran past, and thus at, Aykurt with the weapon in his hand. Allegations that a child, who had just seen his mother's gunshot wound and watched his father shoot his mother's companion, saw his father run toward him with a gun in his hand would support a reasonable inference that the child feared for his own life and physical safety. This circumstance contrasts with the case upon which the defendants rely, Callahan v. Hennessy, No. CV000093104, 2002 WL 241381, at *1 (Conn.Super. 2002), in which the plaintiff alleged that the defendant had caused emotional damage to the plaintiff by acting inappropriately towards the plaintiff's children outside of the plaintiff's presence. Calahan involved no threat of physical danger to the plaintiff. The Amended Complaint reasonably supports an inference that Aykurt suffered severe emotional distress because he reasonably feared for his own life or safety.

The defendants limit their written argument on Aykurt's negligent infliction of emotional distress claim to the issue above. At oral argument, the defendants' attorney conceded that his written argument was so limited but also raised the new argument that Kalican's intentional conduct and Aykurt's presence in the house were not foreseeable to the defendants.[2]

The court disagrees. The Amended Complaint adequately alleges that the defendants' conduct created an unreasonable and foreseeable risk of causing Aykurt emotional distress. In light of the information in the protective order, Ms. Kaya's report that Mr. Kalican had threatened to kill her and her male companion with a revolver that Mr. Kalican had hidden in her basement, and Mr. Kalican's call to the New Haven Police Department in the early hours of September 22, the Amended Complaint would support a reasonable inference that the Mr. Kalican's attack on Ms. Kaya and Mr. Romero was reasonably foreseeable to the defendants.[3] Although the Amended Complaint does not specifically allege that Ms. Kaya notified the police department that her son resided with her, it does allege that she obtained a family violence protective order that covered her residence, which supports a reasonable inference that the City

---

[2]Aside from the arguments discussed herein, defense counsel did not raise, in connection with his motion to dismiss, any other arguments with respect to the tort of negligent infliction of emotional distress.

[3]Although the defendants have not specifically framed their argument on this issue in terms of causation, the court notes that Mr. Kalican's actions could not be considered an intervening cause. The doctrine of intervening cause does not apply where the perpetrator's criminal acts are themselves foreseeable, "and so within the scope of the created risk." Id. at 333 (internal quotation omitted). "To act as an intervening cause, the conduct must entirely break the causal connection between the defendant's conduct and the plaintiff's injuries so as to be the sole proximate cause of those injuries." Id. Given the alleged foreseeability of Mr. Kalican's criminal conduct, it is not an intervening cause.

of New London and the Police Department were informed that Aykurt resided with her. Considering the allegation that Mr. Kalican specifically threatened not only to shoot Ms. Kaya and Mr. Romero, but to do so in Ms. Kaya's house, and the fact that Mr. Kalican complained to the New London Police Department on September 22 that there was a man in this same residence, it was reasonably foreseeable that Mr. Kalican would not only shoot Mr. Romero and Ms. Kaya, but do so at her home, in close proximity to Ms. Kaya's minor children. And it was reasonably foreseeable that such an action would cause severe emotional distress to any children who were present at the time of Mr. Kalican's attack.

Therefore, the court denies the partial motion to dismiss with respect to the claim for negligent infliction of emotional distress in Count VII.

### B. LOSS OF CONSORTIUM CLAIMS

Rulings of the Connecticut Supreme Court foreclose all of the challenged loss of consortium claims. In Gurliacci v. Mayer, the Connecticut Supreme Court held that claims for loss of consortium are limited to claims by one spouse for loss of services, support, and relations of the other, and that such claims are viable only if the couple was married at the time of the injury. 218 Conn. 531, 561-64 (1991) (citing Hopson v. St. Mary's Hosp., 176 Conn. 485, 493 (1979)). Subsequently, in Mendillo v. Bd. of Ed. of East Haddam, the Connecticut Supreme Court declined to recognize a cause of action for loss of parental consortium by a minor child. 246 Conn. 456, 495-96 (1998).

With respect to Count XIV, the plaintiffs argue that other states have permitted loss of consortium claims premised on unmarried intimate relationships. However, the

Connecticut Supreme Court has not revisited its holding in Gurliacci, and the court is bound by that ruling.

With respect to the claims for loss of parental consortium, the plaintiffs point out that Mendillo differed from the present case in that it involved the wrongful discharge of, rather than incapacitating physical injury of, the minor plaintiff's parent. See Plfs.' Mem. Opp. Mot. Dismiss at 19 [Doc. No. 18-2]. One judge trial referee of the Connecticut Superior Court has held that Mendillo does not foreclose claims for loss of parental consortium where a parent has been killed or seriously injured. Petner v. Electrical Contractors, Inc., No. 569450, 2004 WL 2284111 (Conn.Super. Sept. 13, 2004) (Hurley, J.); Chung v. Place Motors, Inc., No. 560074, 2003 WL 553276 (Conn.Super. Feb. 11, 2003) (same).[4] This court, however, finds that Mendillo forecloses all claims for loss of parental consortium. Petner and Chung rely on the opinion of the dissenting justice in Mendillo, who predicted that the rule announced in the majority opinion would soon change. See Chung, 2003 WL 553276, at * 5 (quoting 246 Conn. at 497 (Berdon, J., concurring in part and dissenting in part)); Petner, 2004 WL 2284111, at *1 (quoting same). Although Justice Berdon expressed a strong concern that the relatively mild facts of Mendillo did not provide "the ideal scenario" for examining the viability of a tort of loss of parental consortium, 246 Conn. at 497 n. 2 (Berdon, J., concurring in part and dissenting in part), cited in Chung, 2003 WL 553276, at * 5, he also recognized that the

---

[4]Judge Hartmere also issued a ruling recognizing an action for loss of parental consortium, Watson v. Urology Ctr., No. CV 970404480, 1998 WL 405094 (Conn. Super. July 2, 1998), as well as one recognizing an action for loss of filial consortium, Pacelli v. Dorr, No. CV 960382547S, 1998 WL 470580 (Conn. Super. July 31, 1998), while the Mendillo decision was pending. However, these rulings were not constrained by the Mendillo ruling because of the date on which they were issued.

Mendillo majority had not limited its holding to wrongful discharge cases, but rather announced a rule barring all actions for loss of parental consortium, see 246 Conn. at 497.  Moreover, the reasons that the Mendillo majority offered in support of its holding involved considerations not specific to wrongful discharge claims or the specific facts of Mendillo.  Id. at 477-96.

Turning to Count XIII, the Connecticut Supreme Court has not specifically addressed claims for loss of a sibling's consortium.  Nevertheless, the court is bound by Guirlacci's holding that loss of consortium claims are limited to marriage, and therefore does not find that Connecticut recognizes a cause of action for sibling loss of consortium.

In sum, although the plaintiffs advance normative arguments for expanding the reach of the tort of loss of consortium to parental, unmarried but intimate, and sibling relationships, the Connecticut Supreme Court's rulings limiting loss of consortium claims to marital relationships are controlling on this court.  For this reason, the court grants the partial motion to dismiss with respect to Counts XIII through XVII.

**IV.    CONCLUSION**

For the foregoing reasons, the court GRANTS in part and DENIES in part the defendants' partial motion to dismiss [**Doc. No. 17**].  The court grants this motion with respect to Counts XIII, XIV, XV, XVI, and XVII and denies it with respect to Count VII.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 21st day of August, 2006.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge