AYFER KAYA, ET AL,                           :
      Plaintiffs                        :     CIVIL ACTION NO.
     v.                                   :     3:05-CV-1436 (JCH)
                                  :
CITY OF NEW LONDON, ET AL         :     JANUARY 24, 2008
      Defendants                      :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 84];
DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS [DOC.
NO. 119]; DEFENDANTS' MOTION TO STRIKE [DOC. NO. 121]; PLAINTIFFS'
MOTION FOR LEAVE TO FILE SUPPLEMENTAL AFFIDAVIT [DOC. NO. 125]**

This case arises out of a tragic set of circumstances.  Plaintiffs are Ayfer Kaya,

her minor daughter Aykurt Kalican ("Aykurt"),[1] and Marta Paguada as the Administratrix

of the Estate of David Romero.[2]  Defendants are the City of New London and a number

of its public officials.  Plaintiffs seek to hold the defendants responsible for an incident

in which Kaya's ex-husband, Kurtulus Kalican ("Kurtulus"), entered Kaya's home in the

middle of the night and shot her and Romero with an unregistered handgun he

possessed.  Romero was killed.  Kaya was seriously injured.  Aykurt, then aged seven,

witnessed the shootings firsthand.

Kurtulus had a prior history of domestic violence targeted against Kaya.  At the

time of the shooting, he was subject to a Protective Order that prohibited him from

possessing firearms.  Plaintiffs argue that the defendants should have done more to

ensure that the Order was complied with, and they believe this tragedy could easily

---

[1] Kaya sues on Aykurt's behalf as Aykurt's next friend.

[2] The Second Amended Complaint also names as plaintiffs Sevda Kalican,
Goktay Kalican, and Marta Paguada in her individual capacity.  In a prior ruling, the
court dismissed all claims brought by these plaintiffs.

have been prevented.  Plaintiffs assert a substantive due process claim under 28

U.S.C. § 1983, as well as various state law claims that sound in negligence and

recklessness.  Defendants have moved for summary judgment on all claims.  For the

reasons that follow, the court **GRANTS** the defendants' Motion as to the federal claims.

The court declines to assert supplemental jurisdiction over the state law claims, and it

**DISMISSES** those claims without prejudice.

## I.    STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgement as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once

the moving party has met its burden, the nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present

such evidence as would allow a jury to find in his favor in order to defeat the motion.

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all

inferences in favor of the party against whom summary judgement is sought.

Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a

trial is properly granted only when no rational finder of fact could find in favor of the

non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).

"When reasonable persons, applying the proper legal standards, could differ in their

responses to the question" raised on the basis of the evidence presented, the question

must be left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTUAL BACKGROUND[3]

In 1990, Kaya and Kurtulus were married in an arranged marriage in Turkey. Kaya Aff. ¶¶ 5-6.  The couple subsequently emigrated to the United States and took residence in New London, Connecticut.  <u>Id.</u> ¶ 5.  The marriage produced three children: Aykurt, Goktay, and Sevda.

The family resided together in an apartment that encompassed the second and third floors of a house at 86 Blackhall Street.  Kurtulus owned the entire house, which also included a separate first floor apartment that was rented out, as well as a separate basement.  The basement had only one access point, which was through a padlocked door.

Kaya and Kurtulus had a rocky marriage.  Kaya describes Kurtulus as a "domineering and controlling man," <u>id.</u> ¶ 6, and those qualities sometimes manifested themselves in violent or threatening outbursts directed towards Kaya.  For instance, on November 25, 2001, Kaya called 911 to report a domestic violence incident involving her husband.  11/25/01 911 Tr.  New London police officers Kanaitis, Galante, Christinia, and Suarez, and Segreant Krogud, none of whom are defendants in this action, were dispatched to the residence.  Kaya told the officers that Kurtulus had not physically abused her, although she also told them that Kurtulus had been saying some very objectionable things to her.  Kaya Tr. at 151-52.  The officers chose not to arrest

---

[3] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiffs where there is evidence to support their allegations.

3

Kurtulus, and he was allowed to remain in the home.

On May 24, 2002, Kaya filed for dissolution of her marriage in Superior Court in New London.  Attached to the filing was an agreement entered into between her and Kurtulus.  In describing the custody arrangement, the agreement says there will be "Joint Custody: Kids living with mother all time [sic]," and it also provided for unlimited visitation rights.  Plaintiffs' Exh. J.  The children's primary residence was listed as 86 Blackhall Street.  Id.

The agreement also stated that the 86 Blackhall Street would continue to be owned by Kurtulus.  Kaya and the children were allowed to live at the residence rent free, although Kaya was to be responsible for all bills related to the home, other than mortgage and tax payments.  Id.  The agreement specifically reserved a bedroom for Kurtulus "to keep[] his stuff" and to use "[w]henever he visits the kids."  Id.  The agreement also contained a term prohibiting "living [sic] Boyfriend or overnite [sic] male stay overs [sic] in the property."  Id.  A Court Order subsequently issued on January 9, 2003, granting the divorce and incorporating by reference all the terms of the agreement.

Before the divorce, Kurtulus had been doing out-of-state construction work on weekdays.  Thus during the weekdays he would live with his brother in North Bergen, New Jersey, and on the weekends he would return to the 86 Blackhall residence in New London.  Kaya Aff. ¶ 13.  That living arrangement continued after the divorce.  Id.  Both before and after the divorce, Kurtulus retained keys to the entire residence, including the basement.  Id.

In the early 1990s, Kaya learned that Kurtulus had acquired a handgun from the

4

father of Kurtulus's prior wife.  Id. ¶ 7.  The handgun was never registered to Kurtulus. Id.  For a time, Kurtulus stored the handgun in a safe, but in 2001 he moved the gun to the basement of the 86 Blackhall residence.  Kaya later moved the gun to a different place in the basement, hoping to conceal it from Kurtulus.  Kurtulus learned of the move in late 2001 or early 2002; after he directed various threats towards Kaya, she ultimately told him where she had put the gun.  Kaya Tr. at 61.  Kurtulus then moved the gun to a different concealed spot in the basement.  Kaya did not know exactly where in the basement the concealed gun had been placed, but she did know it was in the basement.  Until the night of the shooting, Kaya never saw the gun again, and at least until August 22, 2003, she continued to believe that it remained hidden in the basement.  Kaya Tr. at 163-64.

Although Kaya and Kurtulus were officially divorced in early 2003, the tension between them did not cease.  On January 19, 2003, Kaya called 911 to report that Kurtulus was harassing her, and she told the dispatcher that she "ha[d] a domestic violence."  The dispatcher asked if Kurtulus had hit her, and Kaya responded that he had not.  1/19/03 911 Tr.  She did tell the dispatcher that he had been "talking stupid stuff in front of my children" and that she did not want her children to hear what he had to say.  Id.  New London police officers Song and Galante, and Sergeant Deltgen, none of whom are defendants, were dispatched to the scene.  Kurtulus was not arrested because, in the view of the responding officers, they lacked probable cause that a crime had been committed.

Kaya called 911 again on July 4, 2003.  This 911 call appears to have been precipitated by the fact that Kurtulus discovered that Kaya had a new boyfriend,

Romero.  Kaya Tr. at 76-77; Kaya Aff. ¶ 15.  Kurtulus became upset and he threatened

to kill Kaya and Romero (the latter of whom was not in the residence at the time).  Kaya

Aff. ¶ 15.

 After dialing 911, Kaya told the dispatcher that there was a domestic violence.

When the dispatcher pressed for more details, Kaya stated that she was having fights

with Kurtulus.  7/4/03 911 Tr.  Although she stated that Kurtulus had not hit her, she

also stated that Kurtulus was "harassing me in front of the kids.  He's calling me names

and I have a broken leg.  I can't move . . . ."  Id.  New London police officers Smith,

Monty and Tryon, and Sergeant Kalolo, none of whom are defendants, were dispatched

to the 86 Blackhall residence.

When the officers arrived, Kaya told them about the threats.  Id.  She also told

the officers that Kurtulus had a gun, and that Kaya believed the gun was in the

basement.  Id.; Kaya Tr. at 77.  Kurtulus denied making the threats and denied having a

gun.  Kaya Aff. ¶ 15.  The officers' response was simply to tell Kurtulus to calm down.

Id.  He was not arrested, and the officers did not search the basement.  Id.

On August 3, 2003, Kaya discovered that the back windshield of her car[4] had

been smashed by someone.  Kaya reported the incident to the police.  Kaya and the

responding police officers suspected that Kurtulus was responsible, but Kaya had not

seen the incident, and so she told the officers that she did not know who had done this.

Kaya Tr. at 156-57.  Her sworn statement to the police said that she did not know who

did this to her vehicle.  No further investigation was done.

---

[4] Although Kaya had use of the car, Kurtulus was the owner of the vehicle.

6

Matters became even more serious on August 21, 2003. On that date, Kurtulus called Romero's cell phone from the phone at the 86 Blackhall residence. Kaya Aff. ¶ 17. When Romero answered, Kurtulus screamed at him and threatened to kill him. Id. Kurtulus then threatened to kill Kaya if Romero ever came into the house, and he began choking Kaya. Id. Kaya called 911 and informed the dispatcher that Kurtulus had choked her. 8/21/03 911 Tr. The dispatcher who took the call was Michael Mariano. Mariano Tr. at 69-70.

New London police officers Suarez and Cavanaugh, neither of whom are defendants here, were sent to the residence. Kaya told the officers about the phone call to Romero, the threats Kurtulus had made, and the choking incident. Officer Suarez verified the choke marks on Kaya's neck. Suarez Tr. at 49. One of the officers also interviewed Aykurt, and she stated that she had witnessed her father choking her mother. Id. at 52.

Officer Cavanaugh took Kaya's statement. In the written statement, Kaya recounts that Kurtulus had been drunk that night. She also recounts that Kurtulus had asked Aykurt to call a male friend of Kaya's. Once Aykurt had done so

> Kurt[ulus] . . . took the phone and called my friend
> obscenities. I went and confronted Kurt[ulus] about what he
> had our daughter do. Kurt[ulus] grabbed me by my neck
> and choked me.
> Kurt[ulus] has told me that if he sees my male friend in my
> house he will kill him and me. Kurt[ulus] has a gun. I do not
> know where its at.

Defendants' Exh. X (8/21/03 Incident Report). The hand-written statement fills up all of the pre-printed lines on the page. Id.

According to Kaya, the handwritten statement was not complete because

Cavanaugh simply stopped writing once he had filled up all of the lines. Kaya Aff. ¶ 17. After the space had filled up, Kaya told Cavanaugh that Kurtulus's gun was in the basement, that it was not registered, and that it had been given to Kurtulus by his former father-in-law, Thomas Smith, of Gales Ferry, Connecticut. Id. Kaya also told Cavanaugh that she was afraid for her life. Id. These facts, which do not appear in the written report, are also not contained in the typed incident report that Cavanaugh later filed. Defendants' Exh. X.

The officers proceeded to arrest Kurtulus for Domestic Breach of the Peace. At the time of the arrest, the officers did not attempt to search the basement for the gun. Kaya Aff. ¶ 18. They also did not ask Kaya for permission to search the basement, nor did they instruct Kaya to attempt to search for the gun herself and turn it over to the police. Id.

The next day, August 22, 2003, Kurtulus was arraigned before the New London Superior Court. The court also entered a protective order against him. Among other things, the Order prohibited Kurtulus from entering Kaya's residence. It also instructed him that within two days he was required to surrender all firearms in his possession. Handwritten Order at 1-2. This Order specifically directed Kurtulus to the firearm surrender obligation imposed on him by Conn. Gen. Stat. §§ 29-36f, i, k.

The actual Protective Order signed by the judge was a handwritten application that the judge endorsed. See Defendants' Exh. CC. That handwritten application contains a checked box stating that, "IT HAS BEEN ALLEGED THAT THE ABOVE-NAMED DEFENDANT . . . possesses one or more firearms." Id. A similar unchecked

box indicated the absence of any allegation that the defendant had a permit for a pistol or revolver.  Id.

The hand-signed Order lists Kurtulus's address as located in North Bergen, NJ. However, a later computer-generated order lists his address as 86 Blackhall Street.[5] The parties dispute which address was actually Kurtulus's residence as of August 22, 2003.  It is undisputed that a copy of the protective order was never sent to the North Bergen Police Department.

On August 23, 2003, the day after the order issued, Officer Suarez escorted Kurtulus to the Blackhall Street residence so that he could retrieve his belongings. Kurtulus did so without incident.  Officer Suarez did not retrieve the gun stored in the basement, and Kurtulus did not remove the gun from its hiding place.

Pursuant to a statutory mandate, see Conn. Gen. Stat. § 29-36n, the Connecticut Commissioner of Public Safety has created a protocol for ensuring that people surrender their firearms in a timely manner when they become ineligible to possess their firearms.  This protocol, which states that it applies to the "law enforcement agency having jurisdiction," requires the police to immediately forward protective orders to the state's Special Licensing and Firearms Unit (SLFU).  The police are instructed to ask SLFU for "any information available on the subject's permit status

---

[5] The discrepancy is apparently explained by the fact that the court's computerized registry system is linked to information previously entered by the police when they arrest an individual.  In this case, the police appear to have listed Kurtulus's address as the Blackhall Street residence at the time they arrested him.  That information was then automatically transferred to the computer-generated Protective Order, even though the handwritten order contained a different address.  See Carver Tr. at 57-61.

and firearms registration data." Then, two days after the subject becomes ineligible, the police must further ask SLFU if the subject has rid himself of his firearm. "In the event there is non-compliance with the requirement to transfer, deliver[,] or surrender any firearm," the police are instructed to "conduct a follow-up investigation."

The New London police officer who coordinates communications with SLFU is Sergeant Weymouth, a defendant in this case. According to Sergeant Weymouth, the New London Police Department will not conduct a follow-up investigation when SLFU informs the police that, according to SLFU's information, the subject has never had a firearm permit or registered weapon. Weymouth Tr. at 57-58. Instead, the Department will only conduct a follow-up investigation if SLFU informs the Department that the subject once had a permit or registered weapon, and no weapon has been surrendered. Id.

In this case, Kurtulus had never had a permit for his firearm, and his firearm was unregistered. Thus, when the New London police queried SLFU about Kurtulus, they were informed that he had never had a permit or registered weapon. Accordingly, New London police never conducted a follow-up investigation, even though the police had information to suggest that Kurtulus possessed an unregistered firearm.

Tragic events soon followed. On the evening of September 21, 2003, Romero arrived at the Blackhall residence and went to bed with Kaya. Later that evening, Kurtulus somehow learned that Romero was staying in the residence.[6] Kurtulus

---

[6] At his criminal trial, Kurtulus testified that he had called Kaya's cell phone in the middle of the night, and that Romero had picked up the phone. Kaya's phone records show that she received three incoming calls, from an unidentified number or numbers, between 1:40 am and 1:50 am in the early morning of September 22, 2003. Kaya

proceeded to call the New London Police Department's Emergency Communications

Center.

Dispatcher Michael Mariano answered Kurtulus's call.  In pertinent part, the call

proceeded as follows:

> Kurtulus: My name is Kurt Kalican. . . . [M]y ex-wife . . . she
> has a has a restraining order . . .
>
> Dispatcher: Right
>
> Kurtulus**:** restraining order against me.
>
> Dispatcher**:** Uh huh.
>
> Kurtulus: But the house is mine . . . but she living in it [sic]
> . . . and our agreement is no male friends overnight at the
> house.
>
> Dispatcher: Uh huh.
>
> Kurtulus: And I called my house now and somebody
> answered my phone.
>
> Dispatcher: Uh huh.
>
> Kurtulus: And how can I report that [sic]?
>
> Dispatcher: To your attorney sir . . . that is totally civil.
> That's a civil agreement right?
>
> Kurtulus: Yes.
>
> Dispatcher: Is that signed by a judge?
>
> Kurtulus: Yes.
>
> Dispatcher: It's signed by a judge that no male can be in the

---

contends that she never heard her phone ring that night, and she appears to dispute
the defendants' contention that Kurtulus spoke to Romero on the phone.  This dispute
is not material to this case, and need not be resolved.

house?

Kurtulus: Yes.  I have court orders.

Dispatcher: Fine.  Talk to your attorney in the morning.

Kurtulus: Yeah . . . well how I can [sic] prove that somebody goes in my house now . . . that they reside in . . . I can prove it other than I am going to prove it [sic].  Hum???

Dispatcher: How are you going to prove it?

Kurtulus: Yes.

Dispatcher: That's a good question.

Kurtulus: How about anybody can go to my house to knock the door [sic].

Dispatcher: Sir. . . Sir.

Kurtulus: I can't go to my house . . .

Dispatcher: Divorces are civil not criminal.  We don't get involved . . . Sir . . .

Kurtulus: (interrupting – unintelligible) Somebody has to help me out.  I have a restraining order against [me] to go in my house.  My own . . . stupid house.

Dispatcher: Sir, I can't help you on that.

Kurtulus: Well . . . who can help me out.

Dispatcher: Sir, you have to go through your attorney.

Kurtulus: Yeah . . . I see my attorney tomorrow . . . what he can do?

Dispatcher: Tell him what's going on.

Kurtulus: Yeah . . . but going on [sic] but I got no proof . . . if you guys not going to knock my door tonight [sic], if you got to [sic] take something writing [sic] . . . how I can [sic] prove to my attorney or my attorney can prove to law [sic]?  Huh?

12

Dispatcher: Sir . . . that is civil, that's not criminal. We only do . . .

Kurtulus: I understand . . .

Dispatcher: Well sir we only do . . . we only do criminal. We don't do civil.

Kurtulus: Thank you.

Dispatcher: Yep.

9/22/03 911 Tr. (all but first three ellipses in original); 9/22/03 911 CD Recording.

Throughout the conversation, Kurtulus sounded relatively calm and collected. 9/22/03 911 CD Recording.

After this call ended, Kurtulus traveled from New Jersey to New London.[7] He arrived at the Blackhall Street residence and retrieved his gun from the basement. He then entered the home, walked into Kaya's bedroom, and shot Kaya and Romero. Kurtulus was apprehended shortly thereafter while traveling on the interstate.

On August 19, 2005, plaintiffs commenced the instant action in Connecticut state court. The case was removed to federal court. In addition to the City of New London, the named defendants are Elizabeth A. Sabila, the City's Mayor; Richard Brown, the City Manager; Bruce Rinehart, the Chief of Police; Michael Lacey, a Captain in the New London Police Department with various administrative responsibilities; William Dittman, a Captain in the New London Police Department with supervisory responsibility over police investigations; Kenneth Edwards Jr., a Captain in the New London Police

---

[7] The plaintiffs suggest that Kurtulus was already en route to New London at the time he called the police. However, their Local Rule 56(a)(2) Statement does not cite evidence to contest this, and in any even the factual dispute is not material to the outcome.

Department with supervisory responsibility over uniformed officers; Sergeant Weymouth; Stephen Crowley and Marshall Segar, Lieutenants with the New London Police Department who had supervisory responsibility over uniformed officers; and Dispatcher Mariano.

## III.    FEDERAL CLAIMS

### A.    Claims in the Complaint

The current version of the plaintiffs' twenty-three count Complaint contains only three counts stating federal claims.  Count 21 alleges that all of the defendants violated Romero's right to due process under the Fourteenth Amendment.  <u>See</u> Doc. No. 94 at 42-45.  Count 22 alleges that all of the defendants violated Kaya's right to due process under the Fourteenth Amendment.  <u>See</u> <u>id.</u> at 45-48.  Count 23 alleges that all of the defendants violated Aykurt's right to due process under the Fourteenth Amendment. <u>See</u> <u>id.</u> at 48-50.  The public official defendants are sued in their individual capacities under 42 U.S.C. § 1983.  The municipality is sued under <u>Monell v. N.Y. City Dept. of Social Servs.</u>, 436 U.S. 658 (1978).

Each of these three counts contains language about both substantive due process <u>and</u> procedural due process.  However, in opposing the defendants' Motion for Summary Judgment, the plaintiffs expressly disavow any procedural due process claim. <u>See</u> Memorandum in Opposition ("Mem. in Opp.") at 7 (explaining that the plaintiffs invoke "the substantive and not the procedural component of the Due Process Clause").  Accordingly, the court deems the plaintiffs to have abandoned any procedural due process claim.

The plaintiffs also contend that their Complaint contains an allegation that the defendants violated their equal protection rights.  See id. at 22-26.  In opposing summary judgment, plaintiffs argue that the New London Police Department discriminated on the basis of gender, or on some other basis, because it treated domestic violence crimes less seriously than other assault crimes.  Id.  However, there is nothing in plaintiffs' Complaint that would have put the defendants on notice of such a claim.  The Complaint contains no mention of the Equal Protection Clause, there are no allegations of unequal treatment, and there are no allegations of discrimination.  The closest the Complaint comes to reaching the issue is the brief statement, contained in counts 21, 22, and 23, that the defendants "created an official policy and custom of arbitrarily enforcing the conditions of Protective Orders."  Doc. No. 94 at 43, 47, 49.  This was insufficient to provide fair notice of the equal protection claim that plaintiffs now assert.  See Bell Atl. Corp. v. Twombley, 127 S. Ct. 1955, 1964 (2007) (explaining that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (ellipsis in original)); Fed. R. Civ. P. 8(a) (requiring complaints to contain a "short and plain statement of the claim").  At this stage in the case, it is too late for plaintiffs to attempt to raise an equal protection claim merely on the basis of their Memorandum in Opposition.[8]

_____

[8] Even if the court were to consider the equal protection claim, the court notes that the plaintiffs have pointed to no evidence that domestic violence cases were treated differently from other similarly situated cases.  Instead, they merely provide evidence that domestic violence cases were mishandled by the defendants.  See Mem. in Opp. at 22-26.
    The plaintiffs do cite to several newspaper articles about the New London police

B.    Substantive Due Process Claim

In light of the above, the sole federal claim presented for adjudication is the

plaintiffs' substantive due process claim.  Plaintiffs believe that, if various New London

officials had been better trained, or had taken more appropriate actions, the events in

this case could have been prevented.

This claim faces as uphill battle because "[a]s a general matter . . . a State's

failure to protect an individual against private violence simply does not constitute a

violation of the Due Process Clause."  DeShaney v. Winnebago County Dept. of Social

Servs., 489 U.S. 189, 197 (1989).  Moreover, plaintiffs face the added hurdle that

government actions will only violate substantive due process rights when the actions

"shock[] the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

On its face, this case seems to come within the DeShaney general rule.  The

essence of plaintiffs' claim is that the New London police failed to protect them from the

_____

department.  See id. at 24.  These articles are inadmissible hearsay (in addition to
being of questionable relevance), and thus cannot be considered on summary
judgment.  See Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004)
(explaining that inadmissable hearsay cannot be used to defeat summary judgment);
United States v. Difeaux, 163 F.3d 725, 729 (2d Cir. 1998) (recognizing that the content
of newspaper articles constitutes hearsay); Holmes v. Gaynor, 313 F. Supp. 2d 345,
358 n.1 (S.D.N.Y. 2004) (refusing to consider the content of newspaper articles in
deciding a summary judgment motion).
     The defendants have filed a Motion to Strike these articles from the record,
pointing out that these articles are inadmissible.  See Doc. No. 121.  This Motion is
**DENIED AS MOOT**.
     After the defendants filed their Motion to Strike, the plaintiffs sought leave to
introduce affidavit evidence attesting to the facts in the articles.  See Doc. No. 125.  The
only grounds articulated to justify this late filing appears to be the fact that the
defendants made a valid objection to plaintiffs' use of the newspaper articles.  Plaintiffs
provide no grounds to excuse their failure to include the affidavit when they filed their
Opposition to the defendants' Motion for Summary Judgment.  The court **DENIES** the
plaintiffs' Motion for Leave to File Supplemental Affidavit.

violent actions of a third party – Kurtulus.

The analysis is slightly more complicated, however, because this Circuit recognizes a narrow exception to the DeShaney rule when there is a "state created danger." Pena v. Deprisco, 432 F.3d 98, 108 (2d Cir. 2005).[9]  Under the state created danger theory, liability can exist based on "the relationship between the [government actors] and the private assailant." Id. at 109.  This theory of liability is a circumscribed one.  The Second Circuit has carefully delineated between "passive" government conduct, which does not create liability, and "affirmative" government conduct, which does.  Id. at 109-110; see also Lombardi v. Whitman, 485 F.3d 73, 79-80 (2d Cir. 2007); Hemphill v. Schott, 141 F.3d 412, 419 (2d Cir. 1998); Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993).

In this Circuit, cases finding affirmative government conduct are all cases in which the government actor has done something to aid and abet the private wrongdoer, or to otherwise encourage the wrongdoer to undertake violent or risky behavior.  For example, in Pena the court found affirmative conduct where defendant police officers had explicitly or implicitly conveyed to another officer that he could drink and drive without fear of punishment.  432 F.3d at 110-11.  In Hemphill, the court found

_____

[9] There is also a separate exception when a "special relationship" exists between a victim and defendant.  Pena, 432 F.3d at 109-110.  Plaintiffs have not suggested that, at least as a matter of federal law, any of the defendants had a special relationship to any of the victims.  See Mem. in Opp. at 10-22.  Such an omission is not surprising; special relationships are usually confined to situations in which the state has taken an individual into custody, or has assumed some form of custodial relationship, as in the cases of incarceration, involuntary commitment, or forced placement in foster care.  See DeShaney, 489 U.S. at 199-200; Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993).  There is no indication that this case involves a relationship sufficiently analogous to these to create a "special relationship."

affirmative conduct when the police actively conspired with a private citizen to shoot the plaintiff, and the police had even handed that private citizen a gun. 141 F.3d at 419. In Dwares, the court found affirmative conduct when the officers had conspired with a group of skinheads and assured them that they could beat up protesters without fear of being stopped by law enforcement. 985 F.2d at 99. And in Lombardi, the court suggested, but did not squarely hold, that there is affirmative conduct when the government knowingly makes a false statement or promise to an individual, and the individual suffers harm from a third party by relying on that statement or promise. 485 F.3d at 80-81.

By contrast, when government officials merely sit idly by, even in the face of an obvious danger, the Second Circuit has not imposed liability. Thus in Pena, supervisors who were aware of an officer's prior similar misconduct, but did nothing to punish that misconduct, were deemed to be merely passive actors. 432 F.3d at 110.

Momentarily putting aside Dispatcher Mariano, plaintiffs have failed to identify any individual official, whether a defendant in this action or not, who had any interaction with Kurtulus that could be said to have affirmatively increased the plaintiffs' risk of harm. Nor is there any indication that any New London officials made knowingly false representations to Kaya.

The closest plaintiffs get to affirmative action is their suggestion that various police officers failed to arrest Kurtulus in several situations when they should have done so.[10] Cf. Pena, 432 F.3d at 110 (suggesting that it is an open question whether

_____

[10] It is a separate question, of course, whether or not the responding officers had a state law duty to act in those situations. Cf. Conn. Gen. Stat. § 46b-38b (mandating

18

"repeated inaction by government officials over a sustained period of time, without explicit advance approval or encouragement of the misbehavior in question, might effectively constitute an implicit 'prior assurance' rising to the level of an affirmative act"). But cf. DeShaney, 489 U.S. at 191-94, 203 (finding no liability in a case where state officials had repeatedly failed to intervene on a number of different occasions). Yet these failures, all of which occurred after Kaya had denied being physically abused, did not amount to explicit or implicit condonation of physical violence against Kaya, and they certainly did not suggest to Kurtulus that he would be free to shoot Kaya. Indeed, once Kurtulus escalated his harassment of Kaya by choking her, the police responded by arresting him.

The plaintiffs point to evidence that a number of defendants (and non-defendant officials) were negligent, and perhaps even deliberately indifferent, to Kaya's predicament. For instance, there is evidence that state officials had specifically informed Chief Rinehart and Captain Lacey that New London's firearm surrender procedures were inadequate specifically because they ignored the possibility that the police could have information indicating that a subject had an unlicensed and unregistered firearm. There is also evidence that various officials failed to fax a copy of the protective order to North Bergen. And there is evidence that some New London police officers may not have dealt with Kaya's case with an appropriate level of professionalism. But that does not suffice to show affirmative acts within the Second

that police officers arrest an individual when they suspect that the individual has committed a family violence crime); id. § 46b-38a (including in the definition of "family violence" an "act of threatened violence that constitutes fear of imminent physical harm").

Circuit's case law.

Indeed, in relying on evidence of deliberate indifference, <u>see</u> Mem. in Opp. at 10-22, the plaintiffs mistakenly rely on cases that suggest that deliberate indifference may sometimes rise to the level of conscience shocking behavior. <u>See</u> <u>id.</u> at 12 (citing, <u>inter alia</u>, <u>Lewis</u>, 523 U.S. at 845). The problem with the plaintiffs' argument is that the requirement of conscience-shocking behavior is a requirement that must be met <u>in addition to</u> the requirement of affirmative government action. <u>See, e.g.</u>, <u>Pena</u>, 432 F.3d at 112-113. Having failed to meet the latter requirement, it is irrelevant whether or not the plaintiffs can meet the former.

The court next turns to defendant Mariano. Alone among the individual defendants in this case, Mariano actually had direct interaction with Kurtulus when he spoke with him on the phone. Yet this interaction surely cannot be said to have affirmatively encouraged Kurtulus to act violently. Instead, Mariano pointed out (correctly) that Kurtulus's complaint dealt with civil matters, not criminal ones. To the extent Mariano encouraged any action by Kurtulus at all, it was simply to encourage him to get in touch with an attorney.[11]

Finally, the plaintiffs contend that the City of New London is liable under <u>Monell</u>.

---

[11] In any event, it is plain that Mariano's behavior was not conscience-shocking. As a 911 dispatcher, Mariano had to react on the spot to Kurtulus's call, and he understandably declined to get involved in what he reasonably understood to be a non-criminal matter. <u>Cf.</u> <u>Lewis</u>, 523 U.S. at 846, 849 (explaining that "only the most egregious official conduct" will shock the conscience, and explaining that mere negligence will <u>never</u> be sufficient to meet this test); <u>O'Connor v. Pierson</u>, 426 F.3d 187, 203 (2d Cir. 2005) (noting that "whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken").

However, plaintiffs have failed to present evidence that any city official – whether named as a defendant or not – violated plaintiffs' constitutional rights.  Without such evidence, there can be no municipal liability.  <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam); <u>Pitchell v. Callan</u>, 13 F.3d 545, 549 (2d Cir. 1994).

The court therefore grants summary judgment to all defendants on the plaintiffs' due process claim.

## IV.    STATE CLAIMS

The plaintiffs' Complaint states a number of claims for relief under state law.  Jurisdiction over these claims exists solely by virtue of 28 U.S.C. § 1367.  However, when all federal claims have been dismissed prior to trial, it is appropriate for the district court to leave the state law claims to the state courts.  <u>Giordano v. City of New York</u>, 274 F.3d 740, 754 (2d Cir. 2001).  Indeed, it is more than appropriate: "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."  <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 57 (2d Cir. 1998).

## V.    CONCLUSION

The defendants' Motion for Summary Judgment [Doc. No. 84] is **GRANTED** with respect to the plaintiffs' federal claims for relief.  Plaintiffs' state law claims still pending are **DISMISSED** without prejudice to refiling in state court.  The defendants' Motion to Strike [Doc. No. 121] is **DENIED AS MOOT**.  The plaintiffs' Motion for Leave to File Supplemental Affidavit [Doc. No. 125] is **DENIED**.

Along with their Reply, defendants filed a Motion for Leave to File Supplemental Exhibits [Doc. No. 119].  That Motion is **DENIED AS MOOT**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 24th day of January, 2008.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge